"I am required by the order of my appointment as temporary administrator of William Weisell, deceased, to deposit funds coming into my hands as such temporary administrator in your company."

And the surrogate's certificate as to his qualification was inclosed. Here was distinct notification as to the way in which the moneys came into its possession. It was put upon its inquiry, and must be held to have been bound by the order, and to have known the law governing the subject.

The order appealed from should be affirmed, with costs.

O'BRIEN, P. J., and PATTERSON and INGRAHAM, JJ., concur. HOUGHTON, J., dissents.

---

(109 App. Div. 476)

### BYRNE v. BYRNE et al.

(Supreme Court, Appellate Division, First Department. December 8, 1905.)

1. EVIDENCE—EXPERTS—WEIGHT OF EVIDENCE—QUESTION FOR JURY.

In a will contest, the weight of evidence of physicians that testatrix at the time she executed the codicil to her will was suffering from a complication of diseases which necessarily affected her mind, and that she had not sufficient mental capacity to make a will, was for the determination of the jury.

[Ed. Note.—For cases in point. see vol. 20, Cent. Dig. Evidence, § 2396; vol. 49, Cent. Dig. Wills, § 768.]

2. WILLS—TESTAMENTARY CAPACITY—QUESTION FOR JURY.

Where testatrix made an unnatural codicil to her will, by which she stripped her only son of his inheritance in case he at any time lived with his father or his father's relatives before becoming of age, whether of his own volition or under compulsion, and there was expert testimony that at the time the codicil was made testatrix was in such poor physical health that she had not testamentary capacity, whether she had testamentary capacity at the time the codicil was executed was for the jury.

[Ed. Note.—For cases in point, see vol. 49, Cent. Dig. Wills, § 768.]

O'Brien, P. J., dissenting.

Appeal from Trial Term, New York County.

Action by Cornelius E. Byrne against Arthur Byrne, impleaded with Albert F. Brugman and others. From a judgment entered on a verdict directed by the court, and from an order denying a motion for a new trial, plaintiff and defendant Arthur Byrne appeal. Reversed.

Argued before O'BRIEN, P. J., and McLAUGHLIN, PATTERSON, CLARKE, and HOUGHTON, JJ.

William L. Snyder, for appellants.
David McClure, for respondents.

PATTERSON, J. This appeal is from a judgment entered upon the verdict of a jury by direction of the court, adjudging certain papers to be the last will and testament and a codicil thereto of Frances Louise Byrne, and from an order denying a motion to set aside the verdict and for a new trial on the judge's minutes. The action was brought under section 2653a of the Code of Civil Procedure.

The testatrix, whose maiden name was Frances Louise Brugman, was the wife of the plaintiff. She was the mother of an infant son, her only child, who was born January 7, 1892. The testatrix died August 5, 1895. The will was made July 5, and the codicil July 10, 1895. They were both admitted to probate. No question is now raised as to the plaintiff's right to maintain the action.

The grounds upon which the will and codicil were assailed are that at the times they were respectively executed the testatrix was and for a long time prior thereto had been weak and feeble in mind and body, suffering from uremia, and a complicaion of physical disorders or diseases, and was not of sound memory and understanding; that she was hovering between life and death, was without testamentary capacity, and hence that the writings admitted to probate were not the last will and testament and codicil thereto of the said Frances Louise Byrne. After making special bequests, not necessary to consider, the testatrix in her will empowers her executors and trustees to pay for the education of her son, Arthur Byrne, from the income of her estate, $100 each year until he arrives at the age of 21 years; but that is coupled with a further provision that they shall pay such other and further sum or sums of money, as they may deem best from time to time, to expend for his education during his minority, and when he arrives at the age of 21 years, he is to receive all the real and personal estate then in the charge of the executors and trustees, provided he chooses at that time to live with the testatrix's family or some member of it, and refuses to live with his father or any member of his father's family; and the testatrix proceeds to say that if he chooses, when he arrives at the age of 21 years, to live with his father or any member of his family—

"Then, and in that case, I give and bequeath all my property to my brothers and sisters to be divided equally among them. And in case my son, Arthur, dies before the age of twenty-one years, I give, devise, and bequeath all my estate of any kind, name, and nature to my surviving brothers and sisters to be divided equally among them."

Thus far, upon a survey of this will, it is to be seen that it was within the intention of the testatrix to give to her infant child when he became able to make a selection, the right and power to determine with whom he should live, as a condition of his enjoyment of his mother's property. By the codicil, made five days after the execution of the will, the testatrix declares that she had attempted to dispose of the residue of her estate both real and personal for the benefit of her infant son, Arthur Byrne, and had been advised that the attempted disposition was uncertain, ambiguous, and likely to cause a question of construction, and thereby she was induced to change, amend, and alter the third clause of the will respecting the said residuary estate, so that the remainder thereof should be given to her executors and trustees in trust to receive the rents and profits until her son, Arthur, attained the age of 21 years, or until his earlier death; and out of the rents, issues, and profits to apply the sum of $100 or more, in their discretion, in each year for his education, maintenance, and support during said time, and—

"Upon his arriving at the age of twenty-one years, and in the event of my said son having continuously lived, cohabited and resided with my family, and blood relatives, or with some member thereof, I give, devise, and bequeath all of the rest, residue, and remainder of my said estate, together with any and all accumulations of rents, issues, and profits then in the hands of my said executors and trustees, to my said son, Arthur Byrne; but in the event of my said son, Arthur Byrne, refusing to and not residing continuously with my family and blood relatives or with some member thereof; or, in the event of his death before he arrives at the age of twenty-one years, then and in that case, or in either of the above events, I give, devise, and bequeath all the rest, residue and remainder of my said estate, both real and personal of whatsoever name, nature, and kind, and wheresoever situated, unto my then surviving brothers and sisters, to be divided among them equally, share and share alike. It being my express wish, will, and desire and also my intention that my said son, Arthur Byrne, should not and shall not receive any share or portion of any of my said estate, if at any time during his minority, he reside, live or cohabit with my husband, Cornelius Byrne, his family, next of kin or blood relatives."

The last clause of this codicil indicates sufficiently the difference between the original will and the codicil respecting the exclusion of the testatrix's son from the interest in remainder in her estate. By the will, his infantile inability to determine with whom he should reside, is recognized. By the clause of the codicil last quoted, he is stripped of his inheritance if at any time in his tender and irresponsible years, and before he can make a choice, or have any freedom of action he should reside, even on compulsion, with his father, or his father's relatives. It is very easy to see that this codicil, so unnatural, was inspired by hatred of the father and his family, and the evidence in the case fortifies that view. There is no direct evidence of undue influence exerted by any particular person upon the testatrix in procuring the execution of this will or its codicil; that is to say, there is no positive evidence that any person connected with the testatrix made direct efforts to induce her to execute a will which should, by any of its provisions be for the benefit of such person. But this is an inofficious codicil; it is contrary to natural duty or affection. It sufficiently appears that the testatrix had a fixed hatred and loathing for her husband, whether well or ill founded, and that is traced and transmitted into the codicil affecting her child. How it originated, we do not know. It may or may not have been the prompting of delusion or the creation of a mind diseased. Under such a situation it became of prime importance to ascertain the mental condition of the testatrix especially when she executed the codicil. Was she then in a situation, physically and mentally, to comprehend her relations to this helpless infant child, or was she in such a condition that without power to discriminate she might have been dominated by feelings of hostility to her husband so strong as to prevail over and conquer the natural impulses of a mother and thus be not "of disposing mind and memory."

The difference between the will and the codicil has been pointed out. The former may be sustained and the latter not. When the latter was made, if the testatrix was suffering from certain diseases, the evidence shows they would affect her mentally. Her physician, Dr. Holmes, who attended upon her from the 14th of December, 1894, until the time of her death, states her general physical con-

dition. He saw her almost every day, and sometimes more than once a day, and according to his testimony, she was suffering from a complication of diseases which naturally (as said before) affected her mind. Three physicians, basing their expert testimony on the facts testified to by Dr. Holmes, swore that a person suffering from those conditions had not sufficient mental capacity to make a will. The learned trial judge directed a verdict, disregarding the testimony of the expert witnesses, evidently so doing upon the view which this court took in a case which has since been reversed by the Court of Appeals. Differing from us, the Court of Appeals, in Hagan v. Sone, 174 N. Y. 318, 66 N. E. 973, expressly held that expert evidence of the character introduced in this case was admissible, and should have been left to the jury for their consideration, saying, that the value and bearing of the evidence, as well as its construction, is for the body to which is committed the decision of all questions of fact. We are of the opinion that all the evidence of the expert witnesses should have gone to the jury in this case, there being abundant proof as to the existence of conditions which might have affected the testamentary capacity of the testatrix.

The judgment and order are therefore reversed, and a new trial ordered, with costs to appellants to abide the event. All concur, except O'BRIEN, P. J., who dissents.

---

(109 App. Div. 530.)

GLOBE & RUTGERS FIRE INS. CO. v. ROBBINS & MYERS CO.

(Supreme Court, Appellate Division, First Department. December 8, 1905.)

INSURANCE—AGENTS—EXISTENCE OF RELATION—EVIDENCE.

In an action for a premium on a fire policy, evidence *held* to show that the one to whom defendant had paid the premium was plaintiff's agent.

Ingraham, J., dissenting.

Appeal from Appellate Term.